UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.4:06CR405 CDP |
| | ) | |
| TOMMIE LEE WEBB, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM
OF UNITED STATES MAGISTRATE JUDGE**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b). A hearing was held on the pretrial motions on October 4, 2006, and after the hearing, the parties were directed to file briefs no later than October 18, 2006. Further, on October 31, 2006, based on allegations made in Defendant's brief, the undersigned ordered the Government to file a supplemental brief no later than November 8, 2006. Thereafter, on November 8, 2006, the Government filed its supplemental brief. Based upon the parties' briefs and the evidence adduced at the hearing on the motions to suppress, the undersigned makes the following findings of fact and conclusions of law:

**Findings of Fact**

Brett Johnson is a Special Agent with the Drug Enforcement Administration. During 2005 and 2006, he and other agents were investigating a large drug trafficking organization operated primarily by Ramon Martinez, who agents believed was responsible for the distribution, on a monthly basis, of 30,000 pounds of marijuana, multi-kilogram quantities of cocaine, and pound quantities of heroin and ecstasy. The agents' investigation showed that Martinez operated from the Rio Grande

Valley near McAllen, Texas, and distributed drugs to Arkansas, Missouri, Illinois, Michigan, and Georgia, among other places.

A court authorized wiretap of a person named Michael Salzman in St. Louis, Missouri, showed that Martinez was supplying Salzman with heroin, marijuana, and ecstasy. This same wiretap revealed that Tommie Lee Webb, the Defendant herein, was communicating with Martinez and was likely also a customer of Martinez. During June and July, 2005, agents overheard several conversations over Salzman's telephone between Salzman and Martinez that revealed that Martinez had directed the delivery of several loads of narcotics to Salzman in return for Salzman delivering cash money to him.

On one of these occasions, on July 19, 2005, agents overheard Salzman talking to Martinez about the delivering two pounds of heroin to Salzman, and in return, Salzman would deliver cash to Martinez. Pursuant to this interception, on July 19, 2005, agents surveilled a meeting between Martinez and Salzman which took place just off of Interstate 55 in a parking lot in Pevely, Missouri. After the Salzman/Martinez meeting was completed, agents followed Martinez a short distance and observed him meet with a second person, who they later identified as the Defendant Tommie Lee Webb. After the Martinez/Webb meeting was over, some of the agents followed Webb to the City of St. Louis where he was stopped by uniformed St. Louis police department officers for a traffic offense and identified as Tommie Lee Webb. Nothing was seized from Webb during the traffic stop, and he was allowed to leave without being given a traffic ticket. At the same time that Webb was being followed by some agents, other agents followed Martinez south on Interstate 55 to just south of Cape Girardeau, Missouri, where he was stopped by the Missouri Highway Patrol. A search of

Martinez's vehicle revealed approximately $42,000 in cash hidden in a compartment in the engine block, along with ledgers detailing several hundred thousand dollars of drug transactions.

Again on July 20, 2005, agents intercepted calls on Salzman's telephone showing that he was going south on Interstate 55 to Arkansas to pick up drugs. Surveillance observed Salzman in the area of Blytheville, Arkansas, meeting with an Hispanic male who was later identified as Merced Rodriguez.

On August 15, 2005, local authorities arrested Merced Rodriguez in Blytheville, Arkansas, and as a result of this arrest, recovered approximately one hundred and sixty pounds of marijuana, and $35,000 in cash. Rodriquez initially cooperated with local authorities and told them his source of supply for narcotics was Ramon Martinez from McAllen, Texas. Rodriguez said that he was handling between one thousand and three thousand pounds of marijuana per month for Martinez. He said that Martinez dealt in ten thousand-pound quantities of marijuana and large amounts of cocaine, heroin, and ecstasy on each trip that he made from McAllen. He said these trips were made on at least a monthly basis. Rodriguez also told the agents that Martinez had the drugs transported in tractor-trailers which contained bales of marijuana and other drugs hidden behind and among produce on the trailer portion of the tractor-trailer. He said that Martinez followed the load of drugs but never drove it himself, and would collect money from his customers and transport it back to Texas. He said that the tractor trailers often had at least ten thousand pounds of marijuana and large amounts of cocaine and heroin. After dropping off the marijuana at a storage premises provided by Rodriguez in Arkansas, more marijuana, heroin, and cocaine would be delivered to customers in St. Louis, Chicago, and Atlanta. He further told agents that Martinez used prepaid track cellular telephones which he passed out to his customers and would only use these telephones to conduct business, often

discarding the telephone and exchanging them for other prepaid telephones. He said that Martinez told him that he was convinced that the seizure of $40,000 and the drug ledgers by the highway patrol on July 19, 2005, was a result of a wiretap on Salzman's or another person's telephone. Also arrested by Arkansas authorities with Rodriguez was Victor Trevino, who admitted being a drug courier from Texas to Arkansas and from whose safe house in McAllen, Texas, DEA agents seized 6,000 pounds of marijuana.

During August and September, 2005, Agent Johnson and other agents of the Drug Enforcement Administration began to organize information from previous wiretaps, informant information, and records so that they could apply for an order to intercept wire communications on what was identified eventually as target telephone #8, a prepaid track phone wireless cellular telephone containing no individual subscriber information. On or about September 28, 2005, Agent Johnson and an Assistant United States Attorney filed an application to intercept wire communications on target telephone # 8, which was identified as a track phone wireless cellular telephone containing phone number 916-369-0858, which the agents believed was being used by Ramon Martinez.

The affidavit which was filed in support of the application to intercept communications on this telephone number contained all of the above information, as well as the following information: At the end of August, 2005, Agent Johnson talked to a reliable source identified as CS #5, who has provided reliable information to DEA in the past. The informant told Agent Johnson that the informant had been in the federal penitentiary with Ramon Martinez during the early 1980s and met him at that time. In 2004, Martinez approached the informant to operate a marijuana storage warehouse in Arkansas, for Martinez's drug trafficking organization of which the informant was aware. Martinez asked the

informant to manage this warehouse and to conduct sales of marijuana to individuals who Martinez would send to the warehouse. He had several discussions with Martinez about setting up this warehouse but, in the end, did not become involved in the Arkansas warehouse operation. The informant, however, did have firsthand knowledge of Martinez's drug operation. The informant had done work for Martinez's drug operation including finding an individual in Pontiac, Michigan, who owed Martinez $600,000 on a past drug debt which he had attempted to elude. Further, the informant told Johnson that Martinez always carries two cellular telephones, one of which he uses strictly for legitimate business, and one for illegal narcotics trafficking. The telephone used for narcotics trafficking is a prepaid cellular telephone that Martinez discards on a regular basis and then purchases new ones. Martinez does not mix his narcotics calls with his personal use cellular telephone which he utilizes for family business. As stated, Martinez changes cellular telephones often and hands out cellular telephones to members of his drug trafficking organization and makes sure that they communicate with him only on these telephones which he hands out. He also switches these telephones on a regular basis, and is aware that government authorities may be listening in on his telephone conversations.

Further, several intercepted calls on the telephone of Michael Salzman show that at the end of June, 2005, Martinez advised Salzman that he was driving to the Missouri area, and would deliver narcotics to him on the night of June 25 or in the morning of June 26, 2005. Martinez called back Salzman on the 25th and 26th and explained to Salzman that he wanted Salzman to meet him south of St. Louis to obtain illegal narcotics from a truck because Martinez did not have a driver to bring it to Salzman. Further, on July 24, 2005, agents intercepted a call between Martinez and Salzman on Salzman's telephone on which Martinez told Salzman that Salzman needed to get a new cellular

telephone because he had a load of narcotics for him, but did not feel safe talking to him until he changed his telephone.

Agent Johnson also stated in the affidavit that target telephone #8 to be intercepted by order of the current affidavit, had been activated in mid-September, 2005, and that an analysis of pen register calls and other records from previous wiretap telephones and other predecessor telephones that were believed to be used by Martinez showed that these telephones were changed on a regular basis, and that when Martinez changed his telephones other people also changed their prepaid telephones.

Further, on September 12, 2005, Agent Johnson had CS #5 place a telephone call to Ramon Martinez on a cellular telephone that Martinez had previously used to contact Salzman. CS #5 talked to a person who identified himself as "Junior" who said he was a nephew of Martinez, and that the cellular telephone had belonged to Martinez but Martinez had given him the cellular telephone to use. CS #5 told Junior that he wished to talk to Martinez and asked that Martinez call him.

On September 13, 2005, Martinez called CS #5 utilizing target telephone #8, the current target telephone for interception. Martinez talked to CS #5 and said that he would call him back the next day because he had some business that he wanted CS #5 to conduct in San Diego, California. Between September 15 and 18, 2005, Martinez called the confidential informant several times utilizing cellular target telephone #8. In these conversations, Martinez gave the confidential informant the name of an individual of Panamanian descent who lived in Atlanta, Georgia, who Martinez wanted the confidential source to find and to collect money from. The money was owed to Martinez as part of a drug debt. During this time frame, specifically on September 18, 2005, Martinez and other individuals gave the confidential source detailed information on the Panamanian and how he could

be found.  Also, on September 18, 2005, Martinez told the confidential source that he wanted him to travel to McAllen, Texas, later that week to discuss the matter in person and not over the telephone.

The pen register information obtained by court order on target telephone #8 revealed numerous contacts between target telephone #8 and other telephones being used by individuals in the Martinez drug organization including contacts with Michael Salzman.

In that regard, on September 25, 2005, Ramon Martinez utilizing target telephone #8 called Michael Salzman utilizing a telephone upon which there was a legal wiretap.  During this investigation, Martinez told Salzman that he had cocaine and marijuana for Salzman and would be enroute to St. Louis during the following week.  Salzman told Martinez that once they sold the narcotics, it would assist Martinez and Salzman in overcoming money problems that they had with payment for the narcotics.  Based on the above probable cause as well as other detailed information on the necessity for the wiretap which will be discussed later, United States District Judge Catherine D. Perry, to whom the application was made, granted an order authorizing the interception of communications on target telephone #8, which, as stated, was a cellular telephone containing the number 916-369-0858.

As soon as the wiretap was activated, the agents began to overhear drug-related conversations, specifically relating to Tommie Webb.   On September 28, 2005, Webb received a phone call from Martinez telling him that he would be leaving Texas soon, and would have drugs to be delivered to Webb.  Martinez asked Webb to travel to Blytheville, Arkansas, and to meet him at a specific motel in Arkansas.  During several overheard conversations on September 29 and 30, 2005, Martinez advised Webb of his progress in obtaining the drugs and told him that he needed to collect

money from him for the drugs, and then would tell Webb of the final arrangements for the drugs to be delivered to him or for Webb to pick the drugs up himself. On September 29, 2005, surveillance agents observed an Avis rental car parked in front of Webb's place of business, Lace & Armor Automotive in St. Louis, Missouri. They observed Webb drive the car from those premises, and followed him south on Interstate 55 to Blytheville, Arkansas. Several times during the trip, Webb called Martinez and advised him of his progress toward Blytheville. The agents observed Webb arrive at the agreed upon motel in Blytheville, and check into Room 115 at the motel. Soon after Webb was in the room, he called Martinez and informed him that he was waiting in Room 115 for him. Some time after this, Martinez arrived at the motel driving a green Suburban automobile, and went into Room 115. After a time, Martinez exited Room 115, the agents followed him through Blytheville, and eventually onto an interstate highway. The agents' plan was to follow Martinez to his safe house or to another source for the drugs. The agents, however, broke off surveillance in Mississippi when the Defendant evidently became suspicious that he was being followed, and began executing several evasive maneuvers with his automobile.

Shortly after this, on about October 2, 2005, conversations over the wiretapped telephone diminished and eventually stopped entirely on October 12, 2005.

The agents nevertheless continued to investigate this matter and to follow up on information they had obtained from the wiretap and from other informants. In this regard, on November 5, 2005, Agent Johnson interviewed Marquis Pena, who told the agents he worked for Martinez in his drug-trafficking organization. Pena told the agents that he operated a safe house in Blytheville, Arkansas for Martinez, and transferred cocaine and marijuana from the safe house to buyers from St. Louis and Chicago. He also said that he collected money and gave it to Martinez. Specifically, Pena said that

he knew Tommie Webb as a customer of Martinez, and that when Webb came to Blytheville, he always stayed at the motel where the agents observed Webb check into on September 29, 2005. He also told the agents that he had delivered 20 kilograms of cocaine to Webb in late September, 2005, in Blytheville.

On December 5, 2005, DEA agents in Saginaw, Michigan, interviewed a person named Phillip Ross who told the agents that in May and September, 2005, an individual he eventually identified as Tommie Webb delivered 300 pounds of marijuana to him. He said that the marijuana was purchased from Alejandro Salazar, but that delivery of the marijuana was supervised by Webb. Based on information provided by Ross, the agents determined that Webb stayed on three different occasions at a Red Roof Inn in the Flint, Michigan area in May and September, 2005. On December 6, 2005, the agents displayed a photographic array of six photographs of similar looking African-American males to Ross. They did not suggest in any way that any of the individuals was Tommie Webb. After viewing the photographs, Ross immediately identified the photograph of Tommie Webb as being the person who delivered the marijuana to him in May and September, 2005.

Because Webb had used Avis rental cars on at least two occasions in meeting Martinez in order to transact drug dealings, the agents, on or about February 1, 2006, subpoenaed information from the Defendant's credit card company in an attempt to determine both when in the past the Defendant had rented cars and stayed at motels, and to be notified immediately by Avis when the Defendant rented cars from them. The information obtained in early February, 2006, showed that the Defendant had rented Avis cars on several occasions for short periods of time in 2005 and early, 2006. A review of credit card receipts also showed that the Defendant had rented and/or paid for motel rooms in the Atlanta area for short stays of one or two days on several occasions. This was

significant to the agents both because the Defendant had used rental cars in other drug transactions and because one of the areas of operation of Martinez, according to the informants, was the Atlanta, Georgia area.

On February 13, 2006, the agents were informed by the Defendant's credit card company and by Avis that the Defendant had rented a vehicle from Avis rental car at the St. Louis airport. On that date and on February 14, 2006, agents observed the vehicle parked at Lace & Armor Automotive on Goodfellow Boulevard in St. Louis. On February 15, 2006, they observed Webb enter the vehicle dressed in "good" clothing and not dressed for work. They followed the vehicle to 2209 McLaran Avenue in the City of St. Louis which they suspected to be a safe house location for the storage of currency and drugs. They observed Webb pull into the driveway of the residence, and drive to the rear area of the house. They observed Webb open the trunk of the vehicle, and after a while, they observed Webb close the trunk. They also saw Webb talking on a cellular telephone during this period of time.

After the trunk was closed, Webb came out of the driveway and onto the street. The agents again observed that Webb was talking on the cellular telephone. Agents then followed Webb onto the interstate and eventually Webb turned south on Interstate 55 heading toward Blytheville, Arkansas; Memphis, Tennessee, and Atlanta, Georgia. Based on the totality of the circumstances present at that point in the investigation, the agents believed that Webb was transporting money to Martinez or another member of Martinez's organization as he had done in the past, and decided to stop Webb's vehicle to investigate and determine if Webb was carrying cash to Martinez and others. In order to effect this, the agents asked the St. Louis County police department to stop Webb's vehicle and to see if Webb would consent to the search of his vehicle. A short time later, St. Louis

County patrol officer James Mowry, stopped the Defendant on the southbound side of Interstate 55 by activating the emergency lights on his marked patrol vehicle. He approached the Defendant's car, told the Defendant he was investigating a road rage incident, and asked him if he had any interaction with other motorists. When the Defendant said that he had not, Mowry asked him where he was going, and the Defendant said he was headed to his sister's house in Imperial, Missouri. Mowry asked the Defendant his sister's address in Imperial, and the Defendant neither knew the numerics of the address or the street name she lived on. Mowry then asked the Defendant if he was carrying any cash, drugs, or large amounts of currency, and the Defendant said he was not. He next asked the Defendant if it was okay to search his car, and the Defendant said it was all right to search the vehicle. Mowry then asked the Defendant if he would step out of the car so he could search it and the Defendant complied with this request. During the search, Mowry found two cellular telephones on the front seat of the vehicle and over $500,000 in cash in two duffel bags in the trunk of the car. When Mowry found the cash, Mowry stated to the Defendant that he believed that the Defendant told him that he did not have any cash in the car. The Defendant replied that he knew nothing about the cash, that it must have been there when he rented the vehicle.

Mowry then contacted the DEA agents, told them of the cash money he had found, and they asked that he make Webb available for questioning relative to the money. Mowry then told the Defendant that other people needed to talk to him about the money at the 4th Precinct Station. The Defendant agreed to do so, and Mowry handcuffed the Defendant, stating that it was for his own protection and for the Defendant's protection. Mowry then conveyed the Defendant in the front seat of his vehicle to the police station. He placed the Defendant in the interview room, left the interview room, and did not interview the Defendant.

Shortly thereafter, Agent Johnson and another agent entered the room. Agent Johnson, prior to talking to the Defendant, told him that he was not under arrest, that there were no charges against him, that he was free to go on his own accord, and would not be detained by them but they just wanted to find out about the money. The Defendant denied knowledge of the money, and was asked by Agent Johnson if he would make a written statement disclaiming any interest in the money. The Defendant then signed a written statement denying any interest in the funds. The Defendant was very cooperative during the interview process and in signing the form. Johnson also took custody of the two cellular telephone seized by the St. Louis County police officer from the Defendant's front seat. One was a prepaid track cellular telephone, the other one was a Nextel telephone. The information from the memory of the telephones was obtained because at least one of the telephones was utilized to communicate with Martinez about drug information, and the information was valuable to their investigation of Martinez and Webb. After the interview was completed, the Defendant was allowed to leave the 4th Precinct Station and go on his way with his rental car.

On or about May 1, 2006, Agent Scott Nethoff from the Saginaw Michigan DEA office arrested Alfredo Salazar in McAllen, Texas. Salazar had been indicted in Michigan for distribution of over five hundred pounds of marijuana in transactions that he had with Phillip Ross. Salazar stated that he had involved Webb in the marijuana transactions because the ultimate source of the marijuana had told him that he needed someone who he could rely upon to supervise the distribution of marijuana in Michigan. Salazar picked Webb for this job because he had known Webb since the early 1970s. Salazar was a good friend of both Webb and Webb's uncle Joe Coates, with whom Salazar had been in the federal penitentiary in the 1970s and 1980s. When Salazar was again released from the Ft. Worth Medical Center of the federal penitentiary system in 2005, Webb picked him up at the

penitentiary and drove him to his home in McAllen, Texas. Also during 2005, Salazar put Webb in touch with Ramon Martinez so that Webb could purchase marijuana and cocaine from Martinez for resale. Ramon Martinez was, according to Salazar, a major source of marijuana and cocaine operating in the Rio Grande Valley in both Mexico and the United States in the McAllen, Texas area. The DEA agent from Michigan displayed a photographic array of six, similar looking African-American males to Salazar on May 1, 2006. No threats or promises were made to Salazar in return for selecting any of the photographs. Likewise, no suggestion to Salazar as to who, if anyone, should be selected in the photographic display. After seeing the display, Salazar immediately picked the photograph of Tommie Webb from the display.

Finally, on June 7, 2006, Ramon Martinez was arrested in McAllen, Texas, and charged with possession of two hundred and fifty-six kilograms of cocaine. Martinez agreed to cooperate with DEA in McAllen, Texas and in St. Louis, Missouri. No threats or promises of any type were made to Martinez to obtain his cooperation. Martinez told the agents that he was supposed to meet Webb in Atlanta, Georgia on June 8 or 9, 2006, and that Webb was supposed to bring with him $300,000 to $500,000 for fifteen kilograms of cocaine which Webb had received from Martinez the week before June 7, 2006. On June 8, 2006, Martinez made a consensually recorded telephone call from McAllen, Texas, to Webb in St. Louis, Missouri. No threats or promises were made to obtain Martinez's consent to make the telephone call, and he was well aware that the telephone call was being recorded. During the telephone conversation, Webb said that he could only raise $230,000, and said he would try to get more money and meet Martinez in a few days. A day later, Martinez made a second consesnsually recorded telephone call to Webb. In the second telephone call, Webb told Martinez that he could bring $230,000 to Memphis, Tennessee, and could leave at about 5 a.m.

on June 10, 2006. Martinez told Webb that he had forty kilograms of cocaine for him, and Webb said he only needed twenty kilograms at this time, but said that he would accept forty kilograms. After the telephone call, Martinez described to Agent Johnson and to other agents the exact type of car that the Defendant would driving, and described a hidden compartment in the vehicle where the money could be found. The hidden compartment was behind the driver's side seat of the vehicle.

At approximately 6 a.m. on June 10, 2006, Agents observed Webb exit Lace & Armor Automotive at 3900 Goodfellow Boulevard. He exited the premises by way of a large bay door, driving a Toyota Camry automobile out of the building which matched perfectly the description of the automobile given to the agents by Martinez. Agents followed the vehicle onto southbound Interstate 55 heading toward Memphis, and stopped the car and arrested the Defendant in the vehicle, eventually charging him with conspiracy to distribute cocaine. The search of the vehicle revealed a hidden compartment behind the rear seat of the vehicle which contained several bundles of cash money, eventually determined by the agents to be approximately $230,000 in U.S. currency. Two cellular telephones were also found in the front seat of the vehicle, and one of the telephones contained the same number called by Martinez on June 8 and 9, 2006.

After the Defendant was arrested on June 10, 2006, the agents made application to a United States Magistrate Judge for a warrant to search Lace & Armor Automotive at 3900 Goodfellow Boulevard in St. Louis, Missouri. The affidavit filed in support of the search warrant contained almost all of the relevant facts of the investigation, including but not limited to the following:

Detailed information about Webb's involvement in the 1999 cocaine distribution network, including the fact that Webb stored cocaine at Lace & Armor Automotive on Goodfellow Boulevard; the Defendant's involvement with Martinez in July, 2005, including the fact that the Defendant met

with Martinez on that date, and that drug ledgers seized from Martinez's vehicle showed that the Defendant owed approximately $360, 000 to Martinez for illegal narcotics; the complete details of the Defendant's meeting with Martinez in the motel room in Blytheville, Arkansas, including the intercepted telephone conversations; the details involving the seizure of the $530,000 seized from the Defendant in February, 2006, and finally, the details of the telephone calls between Martinez and the Defendant on June 7 - 10, 2006, including the fact that the car containing the drug money had been parked inside of Lace & Armor on June 10, 2006, the day on which the search warrant was applied for. Based on this affidavit, a United States Magistrate Judge issued a warrant to search the premises of Lace & Armor Automotive, and to seize drugs, drug ledgers, financial records, cellular telephone records, and any other documentary or physical evidence that related to evidence of a conspiracy to distribute narcotics. The warrant was executed on June 10, 2006, and the agents seized a money counter, scales, and cellular telephone records, all of which were relevant to the drug conspiracy investigation.

## Conclusions of Law

### A. The February 14, 2006 Stop of the Defendant's Rental Vehicle

Based on the above facts, the undersigned concludes that the stop of the Defendant on February 14, 2006 on Interstate 55 to investigate whether the Defendant was transporting money as part of a drug conspiracy was lawful. The undersigned concludes that the agents had ample reasonable suspicion that the Defendant was involved in criminal activity at the time of the stop.

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court held that a police officer may stop a person reasonably suspected of criminal activity, question the person briefly in an effort to confirm or dispel the criminal activity, and even when necessary conduct a limited pat down search for

weapons. Whether or not officers possess reasonable suspicion is to be determined by the court "not in terms of library analysis by scholars, but as understood by those versed in law enforcement." United States v. Atlas, 94 F.3d 447, 450 (8th Cir. 1996). The courts afford a great deal of deference to the conclusions of an officer because the officer may detect criminal activity from conduct that may seem innocent to the untrained eye. United States v. Cortez, 449 U.S. 411, 418-22 (1981). The Supreme Court has held that considered together, several innocent acts may be enough to show reasonable suspicion. United States v. Sokolow, 490 U.S. 1 (1989). In order to support a Terry stop, police must have a particularized and objective basis for suspecting criminal activity at the time of the stop. Ornelas v. United States, 517 U.S. 690, 696 (1996). Among the information that may be used by an officer to determine reasonable suspicion include the police officer's personal observation, the collective knowledge of several law enforcement personnel, as well as information from lay observers and confidential informants. See Terry v. Ohio, supra; Alabama v. White, 496 U.S. 325, 326-27 (1990).

Based on the above law, the undersigned concludes there was ample reasonable suspicion bordering on probable cause to stop the Defendant and ask him a limited number of questions to determine if he was carrying cash money to Martinez which were the product of drug sales, or to purchase marijuana or cocaine from Martinez. Wiretapped conversations between the Defendant and Martinez revealed that in late September, 2005, the Defendant transported cash to Martinez in Blytheville, Arkansas, and later received twenty kilograms of cocaine from Martinez through Marquis Pena, an employee of Martinez in Blytheville, Arkansas. At the time the Defendant transported this money to Martinez in September, 2005, he was driving an Avis rental car rented from the St. Louis airport. Further, the Defendant started his journey from Lace & Armor Automotive on Goodfellow

Boulevard in St. Louis, Missouri. In July, 2005, the Defendant met with Martinez on Interstate 55 between St. Louis and Blytheville, Arkansas, and after the Defendant met with Martinez, Martinez was stopped by the Missouri Highway Patrol, and $41,000 in cash was seized from a hidden compartment in Martinez's vehicle along with drug ledgers showing that the Defendant owed Martinez $360,000 in cash. Additionally, from an individual named Phillip Ross, the agents became aware that the Defendant supervised the delivery of five hundred pounds of marijuana to Ross in Flint, Michigan in May and October, 2005. From other reliable informants, the agents learned that Martinez's drug operation operated a safe house in Blytheville, Arkansas, and from there and other areas distributed drugs to St. Louis, Missouri; Chicago, Illinois; the State of Michigan, including apparently Flint, Michigan, and Atlanta, Georgia.

The Defendant's credit card records showed that from October, 2005 to February, 2006, the Defendant rented numerous Avis rent-a-cars from the St. Louis airport on a number of occasions, and that he stayed in motels in Atlanta, Georgia on several occasions for one or two days. This information was significant because Atlanta, Georgia was one of the major areas of Martinez's drug operation, according to the confidential informants. The agents further were informed on February 13, 2006, that the Defendant had rented an Avis rental car at the St. Louis airport, and they observed this Avis rental car to be parked at Lace & Armor Automotive on Goodfellow Boulevard just as it had been parked prior to the transportation of cash to Martinez in late September, 2005. On February 14, 2006, the Defendant dressed in good clothing, and not in work clothing, drove the rental car to a house which the agents reasonably believed to be a safe house for the storage of drugs and money, opened the trunk of his vehicle as if he were placing something in the trunk, closed the trunk and drove to Interstate 55 and headed south toward Blytheville, Arkansas or Atlanta, Georgia.

Further, the agents observed the Defendant was talking on numerous occasions on the cellular telephone, just as he had in late September, 2005.

Based on all of the above, the undersigned concludes that the agents reasonably suspected that the Defendant was transporting money to Martinez in Arkansas or Atlanta, and had reasonable suspicion to stop the Defendant and ask him a limited number of questions to determine whether he, in fact, was transporting money. The undersigned concludes that this is the course that the agents undertook on February 14, 2006. They asked St. Louis County uniformed officers to stop the Defendant and determine if he was carrying money in his vehicle. The police officers stopped the Defendant, and asked him a limited number of questions directed toward whether or not he was transporting money to Arkansas or Atlanta, Georgia. The officer first asked the Defendant his destination. The Defendant stated that he was coming from St. Louis, and he was going to see his sister in Imperial, Missouri. When the officer asked the Defendant where she lived in Imperial, the Defendant was unable to give either the numerics of the street address or the street name on which she lived. Having received this contradictory information as to where the Defendant was going, the officer asked the Defendant if he was carrying any drugs or cash money in the vehicle. When the Defendant stated that he was not carrying any such contraband, the officer asked if he could search the vehicle, and was granted permission. Thus, within a very short period of time, and only asking the Defendant three or four questions, the police officer was able to either confirm or dispel his suspicion that the Defendant was carrying cash money as part of a drug operation. The undersigned concludes that this is exactly what Terry v.Ohio, and its progeny allow. Therefore, the stop and the questioning were lawful.

B.  Statements Made by Webb to Officer Mowry and the Consent to Search

Further, the undersigned concludes that the Defendant was not in custody for the purposes of being given his Miranda warnings during the initial stop and consent search of the vehicle.  The Supreme Court has held that in most Terry stop situations such as the one in the case now at bar, the Defendant is not in custody for the purposes of being given his Miranda warnings.  In so holding, the Court stated at follows:

> [T] he stop and inquiry must be 'reasonably related in scope to the justification of their initiation.'  Typically, this means that the officer may ask the detainee a moderate number of questions confirming or dispelling the officer's suspicions. . . The comparatively non-threatening character of detentions of this sort explains the absence of any suggestion in our opinion that Terry stops are the subject to the dictates of Miranda.  The similarly non-coercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of Miranda.

Berkemer v. McCarty, 468 U.S. 420, 439-40 (1984).

The determining factor as to whether the defendant is in custody is whether or not a reasonable person in the defendant's position would believe that he was, in fact, in custody or under arrest.  See Berkemer v. McCarty, supra.  In United States v. Boucher, 909 F.2d 1170 (8th Cir. 1990), a highway patrolman stopped the defendant for a traffic violation.  After approaching the vehicle, he requested that the defendant get out of his pickup.  As the defendant left his truck, the officer observed a pistol partially concealed between the seats of the truck.  The officer immediately patted down the defendant and asked him to sit in the patrol car.  He did not tell the defendant that he had observed the weapon or that he was going to arrest him for carrying a concealed weapon. While the officer and the defendant were seated in the patrol car, the officer asked the defendant if he had any weapons or drugs in his truck.  The defendant said he had no weapons or drugs in the truck.  When the truck was eventually searched pursuant to consent, the officer recovered the gun

he had observed, a second loaded weapon, and over fifty pounds of marijuana. In holding the defendant's initial statements should not be suppressed, the court stated as follows:

> A reasonable person in Boucher's position would not have considered Cooper's questioning in the patrol car a custodial interrogation. Boucher was unaware that Cooper had seen a gun in the seat. Boucher had no reason to suspect that Cooper knew of the gun or anything else in the pickup truck at that point, and had no reason to believe that he was suspected of anything other than speeding. Furthermore, as noted above, Cooper was already aware of the gun in the pickup, and it was reasonable for him to question Boucher about it prior to Miranda warnings.

United States v. Boucher, 909 F.2d 1170, 1174 (8th Cir. 1990). See also United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003) (no Miranda warning necessary for persons for a Terry stop).

Based on the above law, the undersigned concludes that the Defendant was not in custody as to the initial questions asked of him by Mowry. Prior to this time, the Defendant was either seated in his own vehicle or standing at the back of his own car while it was being searched. He was not threatened in any way by the police officer in this case, nor was he physically restrained. As in Boucher above, he had no reason to believe that he was under arrest for anything. He had been told that the officers were investigating a road rage incident of which his car might have been involved. This questioning was not followed up any farther than his denial after which the officer immediately asked the Defendant where he was going, and if he could search his vehicle. Thus, despite the fact that the officer testified that the Defendant was not free to leave, this was not conveyed to the Defendant, nor would any reasonable person think he was under arrest or in custody sitting in the front seat of his own car or standing unrestrained at the rear of the car while the car was being searched pursuant to his permission. Further, as stated, the Defendant was very cooperative with the officers, and he was not threatened or intimidated in any way nor was he promised anything for the

statements that he made. Therefore, the undersigned concludes that all of the questions asked by Officer Mowry were related to the reason for his stop (to determine whether or not the Defendant was transporting money), and the Defendant's statements were voluntarily made. Therefore, the statements should not be suppressed.

Further, the undersigned concludes that the consent given by the Defendant to search his vehicle was voluntarily given and, thus, valid. Police officers may search a vehicle if they obtain consent from someone who has adequate authority over the vehicle. Consent is voluntary if it is the product of free choice and not given under coercion or duress. Voluntariness is a fact question to be determined from the totality of the circumstances present. See Schneckloth v. Bustamonte, 412 U.S. 218 (1973); United States v. Matlock, 415 U.S. 164 (1964). Further, one need not necessarily be aware that he may refuse to consent in order to make consent voluntary. Among the factors to be considered in determining whether consent is voluntary include the following: the length of time the person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied on promises made by the police, or whether the consent occurred in public or in a secluded place. See United States v. Chaidez, 906 F.2d 377 (8th Cir. 1990). Applying the above law to the present case, the undersigned concludes that the consent was voluntary. First, the Defendant was the driver of the vehicle and the renter of the car and in complete control of the vehicle, and had adequate authority to grant the search. In addition, the Defendant was not threatened, coerced, or intimidated by Mowry; no promises were made to Webb by Mowry to obtain his consent; consent was given while the Defendant was seated in his own vehicle on a public highway; the Defendant was unrestrained, and the Defendant evidenced a cooperative attitude with the police officer in granting the search. Based on all of the above, the undersigned

21

concludes that Webb voluntarily consented to all aspects of the search of his vehicle. Thus, the undersigned concludes that the search of the vehicle was lawful as was the discovery and seizure of money in the trunk of the vehicle as well as the cellular telephones from the front seat of the car. Therefore, the items seized from the vehicle should not be suppressed.

### C. Statements by Webb to Agent Johnson at the 4th Precinct Station

The undersigned concludes that under the unique facts in the case now at bar, the statement made by Webb to Agent Johnson at the 4th Precinct is a voluntarily made, non-custodial statement. In reaching this conclusion (which the undersigned admits is a very close question), the court will rely on the following facts and law.

As stated by the government, during a Terry stop, officers are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo. Handcuffs can be a reasonable precaution during a Terry stop without turning the stop into an arrest if the circumstances are correct. See United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006). In United States v. Navarrette-Barron, agents observed the defendant leave a motel room in a pickup truck with another person carrying a large duffel bag. The police stopped the vehicle and ordered both men from the vehicle at gunpoint, telling them to keep their arms in the air. They handcuffed both defendants immediately and conducted a search of the vehicle.

In holding that the stop of the vehicle and the detention of the defendants in handcuffs was lawful, the court stated as follows:

> Limits of a Terry stop were also not exceeded when the defendant was handcuffed and placed in the police car while officers searched the truck. There were two suspects and only two police officers at the scene of the initial stop. . . Several other circuits have also found that using handcuffs can be a reasonable precaution during a Terry stop. In light of the dangerous nature of the suspected crime of drug trafficking and the good possibility the driver or passenger had a weapon, the

defendant's confinement with handcuffs in the back of a police car during the search of the truck was reasonably necessary to maintain the status quo to protect the officers and allow them to conduct the search of the truck without interference. Furthermore, the detention did not last for an unreasonably long time. . .

See United States v. Navarette-Barron, 192 F.3d 786, 791 (8th Cir. 1999).

Further, in United States v. Miller, 974 F.2d 953 (8th Cir. 1992), DEA Agents detained two defendants suspected of drug dealing activity at the Kansas City airport while they seized their luggage for further investigation. In upholding the technique of handcuffing them as proper, the court stated as follows:

After carefully reviewing the record, we agree. Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop. The nature of the crime suspected, drug trafficking, created a wholly credible concern that at least some of the suspects might be armed. Given Hicks's legitimate concern for the safety of the officers, the need to detain Miller until the bag could be obtained, and the minimal time Miller spent in handcuffs before the cocaine was discovered, we will not second-guess Hicks's decision that this use of handcuffs was the least intrusive means reasonably necessary to achieve the purposes of his lawful investigative stop.

974 F.2d 953, 957.

In the case now at bar, although the officer was not in imminent danger, the Defendant was suspected of being involved in a large drug trafficking organization, and further, it was explained to the Defendant that the handcuffs would be placed on him for his safety and for the officer's safety. The Defendant was then taken to the 4th Precinct Station where he was placed in an interview room, and where the handcuffs were removed according to Agent Johnson prior to the interview beginning and the Defendant signing the form denying knowledge of the money.

It is also significant that the Defendant evidenced a cooperative attitude, and when he was told by the police officer that he needed to go back to the station and talk to someone about the money, the Defendant voluntarily agreed to do so. In this regard, the court held in Oregon v. Mathiason, 429

U.S. 492 (1977), that a person was not in custody when the police initiated contact with him on the street, and he agreed to come to the patrol office. While in the police station, the police informed him that they suspected him of committing a burglary, and falsely informed him that his fingerprints were found at the scene of the crime. After being told this and also being told by the officers that they suspected him of not telling the truth, the defendant made a statement to the officers admitting his participation in the burglary. In holding that the defendant was not in custody for <u>Miranda</u> purposes, the court stated:

> Such a noncustodial situation is not converted to one in which <u>Miranda</u> applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a 'coercive environment.'

429 U.S. 492, 495.

Further, in <u>United States v. Muldrow</u>, 19 F.3d 1332 (10th Cir. 1994), the court held that stopping a defendant on suspicion of burglary away from the scene of the crime and the defendant giving conflicting statements, rendered reasonable the defendant's transportation back to the scene of the crime by the officers. The court held that this transportation did not convert a <u>Terry</u> stop situation into a formal arrest. <u>See also</u> <u>United States v. Montano-Gudino</u>, 309 F.3d 501, 504 (8th Cir. 2002).

Based on the above law, the undersigned concludes that moving the Defendant from the scene of the stop to the police station did not amount to placing him custody because of the short distance of the transportation, and, most importantly, because of statements made to the Defendant by Agent Johnson prior to the interview taking place. At the start of the interview, Agent Johnson informed the Defendant that he was not under arrest, that there were no charges against him, and that he was free to go on about his business, but that DEA wanted to talk to him about the cash money found in his

car.  The Defendant agreed to do so.  After this, the Defendant denied any knowledge of the money and signed a statement stating that the money was not his.  The interview was evidently short, and according to Agent Johnson, the Defendant was cooperative during the interview.  At the end of the interview, the Defendant was released and allowed to leave the premises.  Evidently, the agents did not intend to arrest the Defendant after he was questioned.  This also lends credence to the fact that the Defendant was not in custody at the time of the interview with Johnson.  See United States v. Sutera, 933 F.2d 641 (8th Cir. 1991).  Therefore, based on the above and **particularly** on the fact that the Defendant was told that he was free to go on about his business prior to being interviewed by Johnson, the undersigned concludes that a reasonable person, after this had been stated to him, would believe that it was no longer incumbent upon him to stay at the interview or to talk to Johnson, and that therefore, the Defendant's statement was voluntarily made while he was not in custody.

D. The Identification of Webb by Ross and Salazar

Based on the above facts, the undersigned concludes that the identification procedures used in Ross and Salazar's identification of the Defendant Tommie Webb were not unnecessarily suggestive and, therefore, were lawful.  Because the procedures used were not unnecessarily suggestive and were fair, the identification should not be suppressed.  The undersigned has viewed the photographic spreads utilized by Special Agent Nethoff of the Drug Enforcement Administration.  The photographic spreads depict in each instance, six African-American males of similar age, description, color, complexion, weight, and general appearance.  Further, the evidence shows that each witness viewed the photographic spread separately from other witnesses, and it was not suggested to either witness, who, if anyone, should be identified.  In order to prevail on this motion, the Defendant must initially show that the identification procedures used were unnecessarily suggestive and may lead to an

irreparably mistaken identification both as to the photographic array and at trial. Stovall v. Denno, 388 U.S. 293. The undersigned concludes that the photographic spreads may not have been absolutely perfect but nevertheless they were very fair. The undersigned further concludes that the procedures used in the identification process were not unnecessarily suggestive, did not suggest to any witness who should be identified, and, in fact, did not suggest that anyone should be identified as the person who was involved in the drug-dealing offense. Thus, the Defendant fails to meet even the minimum threshold that must be proven before suppression of identification may be considered. See Simmons v. United States, 390 U.S. 377 (1968).

Even if the procedures were somewhat suggestive, the undersigned concludes that under the totality of the circumstances, the identifications which were made were reliable. The evidence shows that Ross was involved in two significant drug transactions with the Defendant in May and in October, 2005. In each instance, the Defendant traveled to Michigan, and met with Ross for the purpose of finalizing large sales of marijuana to Ross and delivering the marijuana to him. Thus, Ross's meeting of the Defendant was not for a brief period of time, but was a business transaction that would have taken place over a period of time. As to Mr. Salazar, he had known the Defendant for over twenty-five years, and was a friend of his. Thus, Mr. Salazar's identification, by the very nature of their relationship was reliable. Therefore, the undersigned concludes that there was an independent basis for both identifications, and under the totality of the circumstances the identifications were reliable, and should not be suppressed. See Neil v. Biggers, 409 U.S. 188 (1972).

E.  The Arrest of the Defendant on June 10, 2006

Based on the above, the undersigned concludes that the warrantless arrest of the Defendant is valid as is the search of the Defendant and his vehicle immediately after that arrest.

Police officers may arrest a person without a warrant if they have probable cause to believe that the person arrested has committed a crime. Gerstein v. Pugh, 420 U.S. 103 (1975); Beck v. Ohio, 379 U.S. 89 (1964). Probable cause is a "fluid concept turning on the assessment of probabilities in a particular factual context–not readily or even usefully reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). In the context of a warrantless arrest, all that need be shown is a "fair probability" that a crime has been committed, and that the Defendant committed it. See Illinois v. Gates, supra. It is also clear that information from a reliable informant without more may provide probable cause for an arrest or the issuance of a search warrant. See United States v. Pressley, 978 F.2d 1026 (8th Cir. 1992). In addition, even an anonymous tip from a crime stoppers hotline or information from an informant whose reliability has not been tested is sufficient information upon which to create probable cause as long as there is a sufficient factual basis provided by the person, and the statement is otherwise shown to be reliable through corroboration of even innocent details. See United States v. Briley, 726 F.2d 1301 (8th Cir. 1984).

In the case now at bar, the undersigned concludes that there was ample probable cause shown to arrest the Defendant on June 10, 2006. The agents were aware of the $500,000 in drug proceeds seized from the Defendant in February, 2006, on Interstate 55. In addition, reliable confidential informants had told them that the Defendant was supervising the delivery of large amounts of marijuana from Martinez in Michigan, and the Defendant was independently identified by a separate individual to whom the Defendant delivered the marijuana in Michigan. Further, a separate informant told them that the informant delivered twenty kilos of cocaine in Blytheville, Arkansas, in September, 2005, at the same time lawfully authorized wiretaps of Martinez revealed that the Defendant traveled to Blytheville, Arkansas, in order to exchange cash money for cocaine with Martinez on that date.

Most importantly, after Martinez's arrest on June 10, 2006, he began cooperating with DEA and provided detailed information to them about Webb's continuing involvement with him in cocaine distribution up until the date of his arrest. With Martinez's permission, the agents tape recorded conversations between Martinez and Webb in which Webb was to meet Martinez in Memphis, Tennessee, on June 10, 2006, with approximately $300,000 in cash to give Martinez for twenty to forty kilograms of cocaine. These conversations were recorded with Martinez's consent, and the DEA agents overheard the conversations. Further, Martinez was able to provide specific details of the car that the Defendant would be driving on June 10, 2006, and exactly where the money would be secreted in the hidden compartment in that vehicle. When the Defendant, under the surveillance of DEA, drove that vehicle out of the building at Lace & Armor and onto the interstate highway toward Memphis, Tennessee, the undersigned concludes they had ample probable cause to believe that the Defendant was transporting hundreds of thousands of dollars to Martinez in Memphis for the purpose of purchasing cocaine and, thus, was still involved in a conspiracy to distribute cocaine. Therefore, the arrest of the Defendant was based on probable cause, and was lawful. The search of the Defendant's person incident to that lawful arrest was also lawful. See New York v. Belton, 453 U.S. 454 (1981). In addition, there was ample probable cause to search the Defendant's vehicle for the cash money which they believed was hidden in the hidden compartment, and for any other evidence of drug dealing which might be in the vehicle. Based on the totality of the circumstances, and the facts given to them by Martinez which were corroborated by tape recordings, there was ample probable cause to search the vehicle without a warrant. See Chambers v. Maroney, 399 U.S. 42 (1970); Arkansas v. Sanders, 442 U.S. 753 (1979). Therefore, the seizure of the $230,000 and the cellular telephones from the vehicle was lawful and should not be suppressed.

F.  The Search of Lace & Armor Automotive

Based on the above findings, the undersigned concludes that sufficient probable cause exists to authorize the issuance of the search warrant for Lace & Armor Automotive on Goodfellow Boulevard.  For a search warrant to be valid, it must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities, or fruits of a crime or contraband may be found in the place to be searched.  Johnson v. United States, 333 U.S. 10 (1948); Warden v. Hayden, 387 U.S. 294 (1967).  The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions:

> In dealing with probable cause, however, as the very name implies, we deal with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

Brinegar v. United States, 338 U.S. 160, 175 (1949).  Probable cause is a "fluid concept turning on the assessment of probabilities in particular factual context–not readily or even usefully reduced to a neat set of legal rules."  See Illinois v. Gates, 462 U.S. 213, 232 (1983).  Further, probable cause in an affidavit "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."  Illinois v. Gates, at 232.  Probable cause may be based on the totality of the circumstances present.  All that need be shown for probable cause to search is that there is a "fair probability" that contraband or evidence of a crime will be found at the premises to be searched.  See Illinois v. Gates, supra.  It is also clear that information from a reliable informant without more may provide probable cause for the issuance of a search warrant.  See United States v. Pressley, 978 F.2d 1026 (8th Cir. 1982).  In addition, even an anonymous tip from a crime stoppers hotline or an informant whose reliability has not been tested is sufficient upon which to create probable

cause as long as there is adequate corroboration of even innocent details.  See United States v. Briley, 726 F.2d 1301 (8th Cir. 1984).

Based on the above, the undersigned concludes that there was ample probable cause shown in the affidavit to search the premises at Lace & Armor to determine whether or not evidence of drug dealing was present on the premises.  As stated, the affidavit filed in support of the search warrant contained almost all of the relevant facts of the investigation including but not limited to the following: detailed information about Webb's involvement in the 1999 cocaine distribution network, including the fact that Webb stored cocaine at Lace & Armor Automotive on Goodfellow Boulevard; the Defendant's involvement with Martinez in July, 2005, including the fact that the Defendant met with Martinez on that date, and that drug ledgers seized from Martinez's vehicle showed that the Defendant owed approximately $360,000 to Martinez for illegal narcotics; the complete details of the Defendant's meeting with Martinez in the motel room in Blytheville, Arkansas, including the intercepted telephone conversations; the details involving the seizure of the $530,000 from the Defendant in February, 2006, and, finally, the details of the telephone calls between Martinez and the Defendant on June 7 through 10, 2006, including the fact that the car containing the drug money had been parked inside of Lace & Armor on June 10, 2006, on the day which the search warrant was applied for.

Based on the above, the undersigned concludes that since the trip in which the $500,000 was seized started at Lace & Armor in a rental vehicle, and because the vehicle containing the $230,000 in which the Defendant was arrested, and in which it was found was parked inside the Lace & Armor premises on the exact same date as the issuance of the search warrant, the undersigned concludes that there was at least a "fair probability" that evidence of drug dealing would be found on the premises of Lace & Armor on that same date June 10, 2006.  See Illinois v. Gates, supra.  Therefore, there was

probable cause for the issuance of the warrant. In addition, there is no evidence that the warrant was executed in any way other than a lawful manner. Therefore, the evidence seized from Lace & Armor should not be suppressed.

### G. Consensually Monitored Telephone Calls

Based on the above findings, the undersigned concludes that the conversations between Ramon Martinez and the Defendant Webb on June 7 through 10, 2006, were legally recorded and monitored by DEA agents in McAllen, Texas. The evidence at the hearing revealed that Martinez was arrested on or about June 7, 2006, and agreed to cooperate with DEA officers in McAllen, Texas and St. Louis, Missouri. On June 7, 2006 and thereafter, Martinez made telephone calls to the Defendant in St. Louis, Missouri. These telephone calls were consensually monitored and recorded after the Defendant was asked his permission to record the telephone calls, and agreed to have them recorded. No threats or promises were made to Martinez to record the calls, and Martinez was aware that each of the calls with the Defendant were being recorded. Under these circumstances, it is well established that a law enforcement officer or an informant may record conversations between himself or herself and another person without violating the Fourth Amendment or any other law. See United States v. Sileven, 985 F.2d 962 (8th Cir. 1983); United States v. White, 401 U.S. 745, 752 (1971). Thus, as can be seen by the above, the electronic monitoring and recording telephone calls was lawful, and this evidence should not be suppressed.

### Conclusion

Therefore, the undersigned concludes that the Defendant's motions to suppress contents of electronic surveillance, search warrant , and motion to suppress evidence and statements be denied.

* * *

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Contents of Any and All Electronic Surveillance (Doc. #18–filed 8/11/06); Defendant's Motion to Suppress the Contents of Any Electronic Surveillance and Search Warrant (Doc. #28–dated October 18, 2006), and Motion of Defendant to Suppress Evidence and Statements (Doc. #24–filed 9/19/06) be **denied**.

The parties are advised that they have eleven (11) days in which to file written objections to this recommendation and determination. Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

Further, an order setting this matter for trial is forthcoming from the Honorable Catherine D. Perry, United States District Court.


_____/s/ Terry I. Adelman_____
UNITED STATES MAGISTRATE JUDGE

Dated this <u>12th</u> day of December, 2006.